IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br>Joslyn Renee Rinker,<br><br>    Debtor<br><br>Trustee Lawrence G. Frank,<br><br>    Movant<br><br>Joslyn Renee Rinker,<br><br>    Respondent | Chapter 7<br><br>Case No. 5:24-bk-03055-MJC |

**<u>Debtor's Reply Brief Opposing the Trustee's Rule 2004 Motion</u>**

    Joslyn Rinker has been married to her now-estranged spouse, Michael Rinker, for over 18 years. Throughout their marriage, they both contributed to the household bank account. That account was used to pay household bills, including the mortgage. Such an arrangement of marital finances is common, even where, as here, the deed to the property is in only one spouse's name.

    In August of 2024, Michael moved out of the house that he had shared with Joslyn and their four children (ages 16, 14, 13, and 9). Debtor now has the children the vast majority of the time. Even though the house is in Michael's name only, Joslyn has continued to pay the mortgage. The monthly mortgage payment, at $1,400.83, is substantially less than she could hope to pay in rent for a similarly-sized property to accommodate her household of five.

    The record does not reflect why Michael has not sought to evict her from the home. Maybe it is that the disintegration of the marriage may already have a profound impact on the children, and Michael might feel that he shouldn't compound any emotional damage by

evicting them from their home. Regardless, it is common for a father to continue to let his soon-to-be-ex-wife and their children reside in their house after a marriage falls apart.

Although the facts of this case are not unusual, the trustee feels that the Debtor and her spouse "must have" made some kind of agreement. (Dkt. Entry 30, p. 4, ¶ 15.) The trustee also asserts that the Debtor's contributions to the mortgage may have been fraudulent (Id. at p. 3, ¶ 9), even though countless bankruptcy debtors make such contributions to their spouses' mortgages out of joint household checking accounts.

1. **Standing**

The trustee "maintains that the Debtor has no standing to object to the requested 2004 Examination," but the only case that he provides for that proposition is *In re Mitchell,* No. BR 18-40736-JMM, 2019 WL 1054715 (Bankr. D. Idaho Mar. 5, 2019). In *Mitchell*, a creditor sought a *duces tecum* 2004 examination of a medical center to obtain the debtor's medical records. The debtor objected, and the creditor challenged the debtor's standing to object. The court observed that, though the debtor may have a *privacy* interest in the medical records, that was not enough. Instead, "the general rule is that a party has no standing to quash a subpoena served upon a third party, **except as to claims of privilege** relating to the documents being sought." *Id.* at 2 (emphasis added, quotation marks and citations omitted). Because there is no physician-patient privilege protecting medical records from discovery, the debtor did not have standing to object. *Id.*

Of course, here, Debtor does assert that privilege may be applicable to bar some, though not all, of the trustee's investigation. (Dkt. Entry 34, ¶¶ 3 – 4 discussing the "confidential communications between spouses privilege" at 42 Pa.C.S.A. § 5923 and the

"privilege against adverse spousal testimony" at 42 Pa.C.S.A. § 5924(a).) Thus, to the extent that those privileges are applicable, she has standing to object.

2. ***Trammel***

The trustee cites to *Trammel v. United States,* 445 U.S. 40 (1980)*,* which it describes as holding "that the witness-spouse alone has a privilege to refuse to testify adversely." (Br. at 2.) However, *Trammel* was construing only one of the two privileges at issue here – namely, the privilege against adverse spousal testimony. In fact, the Court specifically observed that the privilege at issue was "not needed to protect information privately disclosed between husband and wife in the confidence of the marital relationship—once described by this Court as 'the best solace of human existence.' Those confidences are privileged under the independent rule protecting confidential marital communications." *Id.* at 51. Thus, *Trammel*, which construes only the spousal communication privilege, does not stand as a bar to Mrs. Rinker's right to raise the confidential communication privilege.[1]

3. **The fact of separation does not destroy the privilege**

The trustee claims that because the parties have separated, there is no marital relationship to preserve, and that the privilege should not apply. However, Debtor's separation from her spouse is irrelevant. Section 5924(a), which applies only in civil cases, has what the Superior Court has characterized as an "identical analogue[] at 42 Pa.C.S.A. § 5913" that applies in criminal cases. *Cap Glass, Inc. v. Coffman*, 130 A.3d 783, 788 n.1 (Pa.

---

[1] For purposes of full disclosure, if an examination is ordered, there does not appear to be any reason that Mrs. Rinker would not advise Michael Rinker of his right to raise the privilege against adverse spousal testimony. Even though she might be prohibited from asserting it on his behalf, if he is unable to afford a lawyer himself, he should be advised that the privilege exists and that he could lawfully choose to refuse to testify against his spouse.

Super 2016). That analogous statute provides that subject to some exceptions,[2] "in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse." Under an analysis that should apply equally here, the Superior Court has found that the analogous criminal statute applies where a couple has separated *and even filed for divorce*, as long as the couple remains legally married. *Com. v. Valle-Velez*, 995 A.2d 1264, 1266 (Pa. Super. 2010).

> Though Appellee and Ms. Fernandez no longer hold themselves out to be married, they are still legally married. That Ms. Fernandez has filed a divorce complaint does nothing to affect their marriage under the law, until the divorce decree is entered. Therefore, their marriage is "lawful" within the laws of Pennsylvania, and but for the express exceptions set forth in the language of the statute, the spousal privilege applies.

*Id*. at 1269. The court rejected the prosecution's policy arguments that the purpose of the privilege is no longer served when the marriage seems broken:

> According to the Commonwealth, to permit Ms. Fernandez to claim the marital privilege when she is cohabitating with another man with whom she is in a committed relationship elevates form over substance that the Pennsylvania Legislature did not intend, since the basis of the privilege is to preserve "marital harmony." Commonwealth's Brief at 12. Thus, the Commonwealth asks us to look beyond the express statutory language at the policy issues surrounding the spousal privilege statute. We decline to do so.

---

[2] There is no exception:
  (1) in proceedings for desertion and maintenance;
  (2) in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them;
  (3) applicable to proof of the fact of marriage, in support of a criminal charge of bigamy alleged to have been committed by or with the other; or
  (4) in any criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape.

> Under the commonly accepted tenets of statutory construction, we must apply statutory language as written, and avoid disregarding the language of a statute "under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b); *Clanton,* 151 A.2d at 92 (commenting that "the language of [the spousal privilege] cannot be ignored in pursuit of its spirit even though a broad or liberal construction would obviously protect society in criminal cases."). The privilege set forth at § 5913, as written, applies to "lawful spouses." 42 Pa.C.S.A. § 5913. In this matter, regardless of their overt acts, Appellee and Ms. Fernandez remain lawful spouses. Therefore, the privilege is applicable.

*Com. v. Valle-Velez*, 995 A.2d 1264, 1270 (Pa. Super. 2010).

The *Valle-Velez* analysis of § 5913 applies with equal force to the "identical analogue[]" at § 5924. Debtor's spouse should not be compelled to testify to her detriment.

**4. The limitation in the Act is not carried into the Code**

The trustee accurately observes that "[t]he limitation on the spousal privilege formerly contained in § 21a of the Act is not carried over in the Code." (Br. at 3, citing Notes of Advisory Committee regarding Rule 2004.) But what does that mean? The Act limited the use of the privilege. Now, the Code does **not** limit the privilege. In other words, with the Code a witness is now free to use the privilege without any statutory limitation.

The competing considerations between Bankruptcy Rule 2004 and the spousal privileges have a long history. The bankruptcy rule seeks to promote access to information, while the applicable spousal privileges limit it. The competition between the two policies dates to the 1800s, immediately after the passage of the Bankruptcy Act of 1898. Section 21(a) of that Act is the precursor to Bankruptcy Rule 2004, and originally provided that:

> A court of bankruptcy may, upon application of any officer, bankrupt, or creditor, by order require any designated person, including the bankrupt, **who is a competent witness under the laws of the State in which the proceedings are pending**, to appear in court or before a referee or the judge of any State court, to be examined concerning the acts, conduct, or property

> of a bankrupt whose estate is in process of administration under this Act.

*See*, *In re Jefferson*, 96 F. 826, 827 (D. Wash. 1899)(quoting the Act, emphasis added).

The emphasized text generally precluded spouses from testifying against bankruptcy debtors, because the spousal privilege was expressed by making a witness "not competent" to testify. For example, in Pennsylvania, the Supreme Court discussed the spousal privilege in these terms:

> At common law husband and wife **are incompetent to testify** against each other. This rule has never been relaxed; on the contrary, it has been reinforced, and guarded from invasion by statutory enactment. Our act of May 23, 1887 (P. L. 158), defining competency, is more than confirmatory of the common-law rule. **It declares in express terms that neither shall be permitted to testify against the other**, . . .

*Canole v. Allen*, 222 Pa. 156, 159 (1908)(emphasis added).

Thus, under the original language of the Bankruptcy Act of 1898, a spouse could not be called for an examination. But that rule was changed. In 1903, the section was amended as follows (in redline form):

> A court of bankruptcy may, upon application of any officer, bankrupt, or creditor, by order require any designated person, including the bankrupt, ~~who is a competent witness under the laws of the State in which the proceedings are pending,~~ <ins>and his wife,</ins> to appear in court or before a referee or a judge of any State court, to be examined concerning the acts, conduct, or property of a bankrupt whose estate is in process of administration under the provisions of this Act<ins>: *Provided,* That the wife may be examined only touching business transacted by her or to which she is a party, and to determine the fact whether she has transacted or been a party to any business of the bankrupt.</ins>

Pub. L. No. 57-62, 32 Stat. 797, § 7 (1903).[3]

---

[3] The citation here is hyperlinked to the Library of Congress records, but as the .pdf file is nearly 2,500 pages, it may take some time to load.

Thus, the statute was explicitly changed to delete the reference to the privilege and to specifically allow the spouse to testify. However, even there the Act specifically provided that the examination was allowed to inquire into only certain transactions.

With the passage of the Bankruptcy Code and Rules, the pendulum swung back. The Rule now provides:

> **(b) Scope of the Examination.**
> (1) *In General.* The examination of an entity under this Rule 2004, or of a debtor under § 343, may relate only to:
> (A) the debtor's acts, conduct, or property;
> (B) the debtor's liabilities and financial condition;
> (C) any matter that may affect the administration of the debtor's estate; or
> (D) the debtor's right to a discharge.

Bankruptcy Rule 2004(b).

Thus, the Rule no longer overrides the privilege. Instead, to the extent that a privilege applies, the Rule does not render it inapplicable.

5. **The privilege has not been waived.**

The trustee argues that Debtor waived the confidentiality of communications by filing an affidavit. (Br. p. 3.) However, that affidavit merely confirmed what Debtor was already statutorily required to disclose to the bankruptcy court. If disclosure is required by statute, then mere compliance with the statute cannot amount to a waiver.

Debtor previously explained this position to the trustee and the Court. In his request to take a 2004 examination of Debtor, the trustee complained that he had sought information, specifically, whether there was "any agreement between the parties as to the disposition of the real estate and payment for [Debtor's] marital property interest, . . ." and that Debtor's counsel had specifically refused to provide that information. (Dkt. Entry 18,

¶ 6.) Debtor's response to that allegation explained the initial concern with waiver of the privilege, but also the subsequent determination that the information could be provided without a waiver:

> [C]ounsel's original response . . . was: "Objection. If any such agreement between the parties existed, it would be a 'communication' between the parties that would be subject to the marital communication privilege." However, . . . the day after the hearing on the trustee's application to be appointed as counsel to the estate, Debtor's counsel withdrew that objection and instead provided a substantive answer with the following explanation:
>
>> * * *
>>
>> my concern is that privileges are fragile. Once a privilege is waived for one purpose, it might be gone altogether. So, I was worried that if I answered this question without asserting the privilege, then my client might not be able to assert it in response to some other question at a later date. However, after hearing your discourse on this topic with the judge I realized something: because Debtor is already required by statute to disclose the existence of any agreement by amending her schedules, compliance with that statutory duty should not be a waiver of the privilege. In other words, by disclosing that there is no agreement, **she is merely confirming for you that she has not failed to comply with her duty to amend the schedules. That confirmation can't be a waiver of the privilege.** So, with that understanding, I can confirm for you that the answer to your question number 7 is that there is no agreement.

(Dkt. Entry 19, ¶ 6, emphasis added, other emphasis removed.)

The Debtor's affidavit merely confirmed that she had complied with her duty to notify the trustee if there were a property settlement agreement within 180 days after the filing of the petition. Complying with her statutory duty is not a voluntary waiver of the privilege.

Case 5:24-bk-03055-MJC   Doc 41   Filed 09/21/25   Entered 09/21/25 20:30:53   Desc
Main Document    Page 8 of 12

6. **The exceptions to § 5924(a) do not apply.**

The trustee asserts that "arguably," certain exceptions to the statute apply. (Br. p. 4.) However, the exceptions that the trustee references are proceedings for divorce, proceedings ancillary to the divorce, proceedings for support, or proceedings for recovery of marital or separate property. The requested 2004 examination is not a proceeding "for" anything other than to investigate the trustee's right to bring claims. None of these exceptions apply.

7. **11 U.S.C. § 541(a)(5).**

Unlike the Debtor, Michael Rinker does not have any affirmative duty to disclose anything to the bankruptcy court. Therefore, the Code would not override the marital communication privilege with respect to his testimony. Nevertheless, if the Trustee agrees to allow Debtor's counsel to cross-examine Michael on this topic,[4] and if the Trustee further agrees that this questioning will not be deemed a waiver of any kind, then Debtor will agree to allow the trustee to ask Michael Rinker the following questions to confirm that Debtor has complied with her affirmative duties to disclose:

(a) As of June 2, 2025, did you and Joslyn ever have any agreement in writing regarding the transfer to Joslyn of any real estate?

(b) As of June 2, 2025, did you and Joslyn ever have any agreement in writing regarding the transfer to Joslyn of any real estate in the event that a divorce action is filed?

(c) As of June 2, 2025, did you and Joslyn ever have any oral agreement regarding the transfer to Joslyn of any real estate?

---

[4] The right to cross-examine is necessary to ensure that if Mr. Rinker – who is unlikely to be represented by counsel – is confused by a question and answers inaccurately, that Debtor has the opportunity to elicit corrective testimony.

  (d) As of June 2, 2025, did you and Joslyn ever have any oral agreement regarding the transfer to Joslyn of any real estate in the event that a divorce action is filed?

8. **Duty to cooperate.**

The trustee, without explanation of any kind, implies that Debtor has failed to comply with her duty to cooperate with the trustee. This accusation is unfair. As in the provisions cited by the Trustee, Debtor acknowledges her statutory duty to cooperate with the Trustee by providing information and by appearing when required. She will continue to cooperate in good faith. But that duty to cooperate does not require her to waive privileges or to surrender the right to oppose actions that would harm her or impair her rights. See *In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993) (debtor has standing as a "person aggrieved" when her rights or pecuniary interests are adversely affected). Here, Debtor believes her spouse is as destitute as she is; both wish to divorce but lack funds to file. If the Trustee were to obtain a large judgment against her spouse that forces a sale of the residence, Debtor would be harmed. She therefore reserves—and expressly asserts—her right to contest any discretionary action that could cause such harm while she continues to comply with her cooperation duties.

9. **§§ 547 and 548 will not be emasculated.**

The preference and fraudulent transfer sections of the Bankruptcy Code will still have plenty of work to accomplish even if the marital privileges are upheld. Many actions under § 547 and § 548 do not involve spouses. And, even where the spouses are involved, some actions can certainly be brought without requiring spousal testimony. The mere existence of § 547 and § 548 does not indicate that Congress intended to implicitly overrule the privileges.

## Conclusion

It is true that, if Debtor's position is upheld, then it would be more difficult for the trustee to gather the information that he desires to attempt to bring a fraudulent conveyance action. But that is the tension that is always present with any privilege. On the one hand, the system benefits from full access to information. On the other hand, providing that access by negating valid claims of privilege diminishes other policies that we have deemed to be societally important. The existence of the tension does not mean that the privilege should be disregarded. To the contrary, in the passage of the Code, Congress removed the limitation on the privilege that had previously been added by amendments to the Bankruptcy Act. And the marital privileges at issue here have a long and important history. One court, in declaring that a spouse could not testify against a bankrupt debtor, explained that the need to reduce the risk of fraud does not justify disregard of the privilege:

> There is another reason for sustaining the objections, which is controlling. The fourth amendment to the constitution of the United States declares, 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated.' Of what avail is it to protect a man in his person, house, papers, and effects, if the members of his family may be dragged before an inquisition, and compelled, on pain of incarceration in a common jail, to divulge the confidential communications made to his wife? The unreasonableness of such a proceeding consists in its tendency to destroy that confidence between husband and wife necessary to harmony and happiness in the marriage relation, which it is the policy of the law to hold sacred, and in the strong temptation to commit perjury to which it must necessarily expose a woman during coverture. In the argument it has been urged that the inquiry is necessary to prevent fraud and injustice, but the same argument would be equally potent in favor of the right to search the persons of a bankrupt and his wife, and ransack their home, to find hidden wealth. The rights of creditors are important, but they do not outweigh the interest which the public has in

preserving the peace and happiness of families. For these reasons I hold that all communications which Mr. Jefferson may have made to his wife respecting his income or property are privileged.

Respectfully submitted,

Date: September 21, 2025

s/ Carlo Sabatini
Carlo Sabatini, Attorney for Debtor
Bar Number PA 83831
Sabatini Law Firm, LLC
216 N. Blakely St.
Dunmore, PA 18512
Phone (570) 341-9000
Email carlo@bankruptcypa.com

## Certificate of Service

On September 21, 2025, I deposited the foregoing document into the mail, addressed to:

Michael Jason Rinker
100 Pecora Road
Drums, PA 18222

As the date of mailing is a Sunday, the mail piece will not be postmarked until September 22, 2025.

/ Carlo Sabatini
Carlo Sabatini